HALL PRINTING PRESS CO. et al. v. GEORGE MANN & CO., Limited, et al.

(District Court, S. D. New York. December 11, 1916.)

No. E 13–178.

PATENTS ☞328—INVENTION—PRINTING MACHINE.

The White patent, No. 770,488, for a rotary planographic transfer printing press, and relating to the device for tripping the transfer cylinder when a sheet is missed, *held* void for lack of invention, in view of the prior printing press art.

In Equity. Suit by the Hall Printing Press Company and the Miehle Printing Press & Manufacturing Company against George Mann & Co., Limited, George C. H. Wichmann, Arthur B. Evans, and Harold Dawson. On final hearing. Decree for defendants.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

This is the usual bill for infringement of a patent. The machine is in the art of rotary planographic transfer printing presses, the patent, No. 770,488, being for the "tripping," or movement of the middle or transfer cylinder from the other two; such movement being within the control of the pressman, with sufficient speed to remedy the difficulties otherwise arising whenever a sheet is missed. In machines of this character the "form," or printing, cylinder, which is furthest removed from the impression cylinder, has a sector of its periphery covered by the printing surface, which generally consists of a zinc or aluminum plate tightly stretched, and upon each rotation inked by various inking and dampening devices which are well known in the art. The second, or transfer, cylinder, which contacts with the "form," also has upon a sector of its periphery a rubber "blanket," so called, which takes the ink impression from the aluminum plate in sufficient quantity to do the printing. Having received the ink from the aluminum plate, the transfer cylinder continues to rotate, and eventually contacts with the third, or impression, cylinder. When all goes well, the sheet separates the impression cylinder from the transfer cylinder during that part of the cycle when the transfer blanket is in contact; but, if a sheet be missed, the blanket will print upon the impression cylinder, losing a part of its ink. As the transfer cylinder continues to rotate, the zinc plate, which itself has been re-inked by the ink rolls, will give it a double quantity. The result will be that the next sheet will not only get upon its front too great a quantity of ink, but it will receive an offset from the impression cylinder upon its back, and thus it will be ruined. The invention consists in the mechanism by which the transfer cylinder may be immediately moved out of contact with both the form cylinder and the impression cylinder, as soon as the operator sees that he has missed a sheet. This is accomplished by mounting the transfer cylinder eccentrically in a way quite common in the arts. The claims in suit are the following:

"13. In a printing machine, the combination of a planographic form-carrying cylinder, ink and water rollers adjacent thereto, a transfer cylinder having a yielding surface, an impression cylinder, and means for separating the transfer cylinder from both the form cylinder and the impression cylinder, substantially as described."

"15. In a printing machine, the combination of a planographic form-carrying cylinder, ink and water rollers adjacent thereto, a transfer cylinder having a yielding transfer surface, an impression cylinder, and means for moving the transfer cylinder to place the transfer cylinder out of printing relation with both the form cylinder and the impression cylinder, when desired, substantially as described."

"23. In a printing machine having a planographic form-carrying cylinder, the form consisting of a metal sheet, clamps for holding said sheet to the cylinder, a transfer cylinder having a yielding blanket and straining devices for said blanket, and an impression cylinder, means for moving the transfer cylinder to place the transfer cylinder out of printing relation with both form cylinder and the impression cylinder, substantially as described."

The defendant raised two questions, invalidity and double patenting. As the second point is not considered in the claim, the facts are not given in regard to it.

Charles C. Linthicum and George F. Scull, both of New York City, for plaintiffs.

Victor D. Borst, of New York City, for defendants.

LEARNED HAND, District Judge (after stating the facts as above). In this case infringement, though not formally conceded, is so obvious, however the claims be taken, that I may pass it over without more.

The next—and, as I view it, the only—question is of validity under the prior art. To an intelligent understanding of the patent it is necessary to consider what is the art of rotary planographic printing

and how it grew. It represents in fact the convergence of two quite independent branches of the printing art: First, lithography, which, as its name implies, is the printing from a flat stone bed; and, second, the rotary press. Each of these arts was very old at the beginning of the twentieth century, but they had, at least in the United States, never been combined. In lithography no substance had for long been perfected which could be rolled upon a cylinder, without which the flat bed remained a necessity. It is true that the German patent to Bohn & Huber, which was applied for in April, 1893, was for a rotary planographic press; but either it was not successful, or its use was confined to Germany, because there had appeared nothing of the sort in the United States before 1901. In September of that year White, the patentee here, filed his application for a true rotary indirect planograph, which resulted in patent No. 705,180; but the record does not show that it was ever made and used. It was a modification of his earlier rotary direct press, patented in No. 689,527, and was intended only for heavy materials, such as tin, glass, and the like. In August, 1903, Rubel planned a true rotary indirect planograph, which was worked out by Tucker, and bore the name of the capitalist, Kellogg, who put it out. This press was for printing paper and completed the art. The question in this case turns wholly upon the relative movements of the cylinders in such a press as Kellogg's.

I have presupposed heretofore, with substantial accuracy, that all rotary presses, not of planographic type, printed directly from the form cylinder. A patent like Clause, 585,907, was an exception in the art, and the rubber transfer sheet was apparently added for printing on tin or other hard substances. The transfer cylinder was, however, well known in the lithographic art, at least in the early 80's, and had been thoroughly developed just, as it appears, after the rotary planograph went into use.

In both kinds of press, the rotary direct and the indirect lithograph, obviously the pressman would occasionally miss a sheet, because we are considering always a sheet-fed press, and no one has yet made an automatic sheet feed. When this happened in the direct rotary press, if it kept running, the form would touch the impression cylinder and ink its surface. The next sheet would therefore carry an offset on its back, and the next, and so on, till the impression cylinder had been cleaned by successive sheets. It became, therefore, practically a necessity to trip the impression cylinder from the form, or the form from the impression cylinder, and the art responded to the need in repeated instances. In some of the patents cited by the defendants this purpose expressly appears: Toyc, 557,626, page 3, lines 85–112; White, 689,-527, page 2, lines 65–67. A very common means of tripping the press was to mount the impression cylinder eccentrically, and have a hand lever or pedal by which the operator could throw it out of contact with the form, by a device similar to that shown in Fenner, 276,015. Sometimes it was the impression cylinder that was moved, as in Hawkins, 272,835, and many others cited by the defendants; sometimes it was the form, as in the little auxiliary cylinder of Buxton et al., 405,009, Figure 8, cylinder B, or in Spalckhaver, 703,491. Thus, in the rotary

press art, the separation of the cylinders for all the purposes which White's present patent shows was a well-understood commonplace.

The same need was differently answered in the lithographic press, because of its different constitution, and of the necessarily intermittent nature of its operation. It must be remembered that the printing stone must by hypothesis be flat, and its movement therefore rectilinear. Obviously that movement must therefore be reciprocating, and if it was coupled directly with an impression cylinder it was equally necessary that during the return stroke the contact between them should be in some way broken. When indirect lithographic presses came in, the contact between the transfer cylinder and the stone had also to be broken in the same way, though the transfer and impression cylinder might remain together. Whether there was or was not a transfer cylinder, the separation of the bed stone from its contact during the reciprocating movement was accomplished by cutting away enough of the transfer or impression cylinder to effect a clearance at the proper part of its circumference. The cylinder was then automatically stopped when the stone was to return, and the clearance was enough to keep the face of the stone from being smudged. The impression cylinder was likewise stopped, and in contact with the transfer cylinder, during this portion of the cycle, if the press was indirect. In such a press, if the sheet were to be missed, however, the impression roller and the transfer cylinder would begin to rotate again on the next stroke, and the impression cylinder would carry off the ink from the transfer, and the transfer cylinder itself would be inked twice by the stone. Hence the same necessity arose for some device by which these results could be avoided, and this device was only a prolongation of the stasis of both cylinders for one and one-half cycles, instead of one-half a cycle. While this effected a separation of stone from transfer, it did not move them apart. Ford likewise devised a separation of the impression from the transfer cylinders in such machines; but it was not necessary to use this when a sheet was missed, and it was not in fact capable of being used for that purpose.

Such was the situation in each of the two lines which converged in the first years of the century to form the rotary planograph transfer press which is here in question. The press being the old lithographic transfer press in which the stone was superseded by a rotary cylinder, it must be apparent that the same problem arose when a sheet was missed as had arisen in each of the arts from which it was descended. Therefore it took no invention from the vantage ground of prior experience to see that there must be either a stasis of the machine, or a separation, not only of the transfer and the form, but of the impression and the transfer. A stasis of the press was well known to be a disadvantage; indeed, its avoidance was one of the important reasons for a rotary press. The throwing out of the cylinders was therefore directly indicated by the whole history of the rotary direct presses. But to abandon the stasis as a means involved with equal obviousness the separation of all three, because, though the form were separated from the transfer cylinders, the latter would smudge the impression roller and print a set-off on the back of the next sheet, and, though

the impression were separated from the transfer, the form would smudge the transfer, or at least give it too much ink for the next sheet. The first efforts at a rotary planograph which appear to have been made in the United States, as has been said, were those of White himself, in his machine described in 705,180 and 705,181, and this press was not for the printing of paper, but of thick materials, such as tin or the like. White combined the impression and the form cylinders into one, and put his transfer cylinder above that. It followed that this transfer cylinder must bob up and down, since it must at once allow for a substantial space between itself and the impression roller when the metal sheet was being printed, and must be in direct and more or less forcible contact with the form cylinder when it was to be inked. This White accomplished by a complicated toggle joint, which is not important here, except to say that he annexed a tripping device by which the transfer cylinder could be permanently kept out of engagement with both the form and the impression cylinder. Moreover, it is quite apparent from Figure 5, if proof were necessary, that White regarded two cylinders and three as interchangeable. Here, then, was an incontestable example in the prior art of a transfer cylinder which was movable into and out of position with the form and impression cylinders, except that these chanced to be united into one.

However, the defendant distinguishes this patent by the fact that, if this machine be used on paper, the tripping mechanism will not work, because the upper limit of the transfer cylinder's motion is fixed by a set-screw, 22, which determines the pressure upon the metal sheet to be printed; the set screw being stopped by the frame when the sheet is passing through. Hence, they say, if the set screw were so fixed as to print paper, the transfer cylinder must always contact with the lower cylinder, which carries the two surfaces. This is plausible, but unsound, as White's earlier patent, 689,527, for a direct rotary press, discloses. This was obviously the immediate ancestor of the planograph of 1901, as any study of its details will show. It had two inking surfaces and two printing forms, all upon the same cylinder, and the transfer cylinder of 705,180 was still an impression cylinder. White had, moreover, in this press to provide for the separation of these cylinders whenever the inking surfaces became tangent with the impression cylinder, and this he did by a cam groove, precisely the same as in 705,180. All he did was to take over this earlier press, consolidate his two form surfaces into one surface, change one of his inking surfaces into an impression surface, and make over his impression cylinder into a transfer cylinder. Of course, I am not suggesting that this was not an invention; I am trying to come at changes in the mechanism. When he had done this, however, his machine would not work, for one reason, which was that, when the impression surface of this reconstituted machine was opposite the now transfer cylinder, the toggle was broken, and that cylinder, having no stop, would separate by as much as the resilience of the springs, 17, allowed. Hence he found it necessary to add the set screw and the stop, 23, in his patent. But all this was because he wished to print on thick sheets. The press, 689,-

527, as it stood, from which he got his idea of a rotary indirect planograph, would have been more easily adapted to paper printing than to metal sheet printing. All White had to do in that case with the large cylinder was to change one form surface into an impression surface, and eliminate one inking surface. His trip would then have operated when a sheet was missed, exactly as he had expected it to do when the press was direct. He had, in short, to work out an added difficulty, just because he did not confine it to printing paper.

A comparison of these patents, therefore, shows a greater departure from patent 689,527 in 705,180 than in the patent in suit, of course assuming that a single cylinder with two surfaces is an obvious equivalent for two cylinders, as White has confessed in Figure 5 of patent 705,181. If so, it can hardly be said that there was any invention in the patent in suit over 705,180 and 705,181. It is apparent that the only reason why these patents do not answer the patent in suit is because White was not aiming at a paper press at that time, but at metal sheets. This, indeed, he says himself (questions 73–75, in rebuttal). He had in mind the possibility of printing paper, but it was not till after the Kellogg press came out that he made the trial. Indeed, I am not sure that he did not think his disclosure adequate already to the printing of paper (705,180, page 2, lines 20–32; 705,181, page 1, lines 92–99). · Why the art continued to the idea that a rotary transfer lithographic press must be used on heavy material the record does not show; but it does show, I think, beyond the possibility of doubt, that the reason did not lie in any difficulty in separating the cylinders, which is the important matter here. It is, of course, possible to let any new combination paralyze our whole thinking and to stand inert before it, mouthing sententiousness; but, if we are to exert ourselves in such cases to examine just what the advance is, I can have no doubt that we must find it did not lie in the combinations here claimed.

Yet, even laying aside White's earlier patents, I think that the same result follows from the art as a whole. The Kellogg press was completed in August, 1903, though all the cylinders were without tripping devices. The machine had been used, however, hardly a month when it became apparent that some arrangement was necessary to trip the impression roller when a sheet was missed, and this feature was added at once without difficulty, borrowing from the rotary art. It is quite true that the machine still left the transfer and form cylinders always in connection, and was to that extent not an anticipation. What is invention in this aspect, therefore, depends upon whether, taking the art as a whole, that step is enough. Invention is, of course, not susceptible of certain formulation; but I have no doubt that such a change is not enough. The first inventor tripped the cylinder which he had seen tripped before—the impression cylinder. He did not think to trip the transfer cylinder, probably because the thing was new. I agree that it was not immediately obvious that the transfer cylinder should also be tripped, but I entirely decline to recognize as invention every advance which is not immediately forecast as the art progresses. In the lithographic art the transfer cylinder had

always been kept separated, when the sheet was missed. It was absolutely inevitable, as soon as the rotary planograph went into operation, that the same necessity would develop as had developed in the old stone presses. The art carried the "problem" implicit in it in such wise that not the stupidest artisan could have eventually failed to recognize it. As soon as it was recognized, the means lay already at hand, means even applied already in the same case in 750,180, and generally in all the rotary presses. With means at hand and need inevitable, what room is there for invention?

Nor is the case one where such a priori considerations are upset by the history of the industry. The case is not one where men were waiting for this element, which, when once discovered, liberated an art and created a new industry. There is not the slightest reason to suspect that this combination had anything to do with the time at which rotary planographic transfer presses appeared. Indeed, we know the contrary, because we know that Kellogg's was the first, and did not have it. Just what the art waited for does not certainly appear; but there had been no tentative and unsuccessful efforts, which failed because no one could manage the separation of cylinders, or because no one saw that cylinders should be separated. Under such circumstances it would, in my judgment, be a wholly gratuitous bestowal to give White a monopoly of the whole industry by virtue of a detail which he had in fact himself disclosed more than two years before.

In this view, it becomes unnecessary to consider the question of double patenting.

Bill dismissed, with costs.